UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

VS.                                           CASE NO. 6:23-mj-2348-EJK

**JOSHUA JOSEPH GRAY** and
**GEORGE DOUGLAS METZ**
_____/

**ORDER**

This cause comes before the Court on Defendants Joshua Joseph Gray's and George Douglas Metz's Renewed Oral Motions to Dismiss Information or for Judgment of Acquittal (collectively the "Motions"), filed May 17, 2024 (Docs. 53, 54), and Metz's Motion to Renew Defense Motion for Judgment of Acquittal, filed July 12, 2024 (Doc. 67). Upon consideration, the Motions are due to be denied.

**I.     BACKGROUND**

On November 28, 2023, Joshua Joseph Gray and George Douglas Metz ("Defendants") were charged by information with multiple counts of violating 41 C.F.R. §§ 102-74.385 and 102-74.420. (Doc. 1.)

Specifically, Defendant Gray is charged with violating Section 102-74.385 in Counts One, Five, and Seven of the Information for incidents occurring on November 16, 2022, January 26, 2023, and January 30, 2023, respectively. (*Id*.) Defendant Metz is charged with violating Section 102-74.385 in Counts Three, Five, and Seven of the Information for incidents occurring on January 6, 2023, January 26, 2023, and January 30, 2023, respectively. (*Id*.) Defendant Gray is charged with violating Section 102-

74.420 in Counts Two, Six, and Eight of the Information for incidents occurring on November 16, 2022, January 26, 2023, and January 30, 2023, respectively. (*Id.*) Defendant Metz is charged with violating Section 102-74.420 in Counts Four, Six, and Eight of the Information for incidents occurring on January 6, 2023, January 26, 2023, and January 30, 2023, respectively. (*Id.*) These charges stem from Defendants entering different Social Security Administration ("SSA") offices on the dates alleged and filming inside, despite posted signs prohibiting filming and instructions to stop filming from protective security officers ("PSO"). (*Id.*)

Gray initially moved to dismiss the information against him. (Docs. 35, 36) However, the undersigned denied the motion to allow the factual record to develop at trial. (Doc. 45.) A two-day bench trial occurred before the Court on May 16, 2024. (Docs. 51, 52.) Following the bench trial, the Court reserved ruling on the Motions and directed the parties to file further briefing to answer some preliminary questions the undersigned had based on the trial. (Doc. 57.) The Court asked the parties to answer the following questions in its briefing: 1) Does 41 C.F.R. § 102-74.420 apply to video recordings; 2) Is the space Defendants are seen recording at in the videos considered a space "occupied by a tenant agency" or is it considered "[b]uilding entrances, lobbies, foyers, corridors, or auditoriums" under 41 C.F.R. § 102-74.420; and 3) What is the definition of "news purposes" as stated in 41 C.F.R. § 102-74.420 and do Defendants as YouTube content creators (Gov. Ex. 12a, 12b, 12c, 13a, 13b, 13c) fall under that definition. (Trial Tr. vol. 2, 35:7–25.) On July 12, 2024, the parties filed respective briefing. (Docs. 66, 67, 68.) On July 18, 2024, the Court held a hearing and heard further

oral argument from the parties as to the Court's preliminary questions. The Motions are now ripe for review.

## II.   STANDARD

An information must "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An information is sufficient if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which [they] must defend, and second, enables [them] to plea an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Paccholi*, 718 F.3d 1294, 1307 (11th Cir. 2013) (internal quotations omitted). The factual allegations contained in an information are examined in the light most favorable to the government; thus, a court must deny a motion to dismiss if the facts are sufficient to charge an offense as a matter of law. *United States v. Al-Arian*, 308 F. Supp. 2d 1322, 1332 (11th Cir. 2004). In evaluating a motion to dismiss for failure to state an offense, a district court is limited to reviewing the face of the indictment, and more specifically, "the language used to charge the crimes." *See United States v. Sharp*, 438 F.3d 1257, 1263 (11th Cir. 2006) (citing *United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992)). A court may not dismiss an information on a determination of facts that should have been developed at trial. *Id.* (quotations omitted) (citing *United States v. Torkington*, 812 F.2d 1347, 1354 (11th Cir. 1987)).

As to the motion for judgment of acquittal, Federal Rule of Criminal Procedure 29 states:

> After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction, If the court denies a motion for judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.

Fed. R. Crim. P. 29(a). "The standard for assessing the sufficiency of evidence is whether any reasonable view of the evidence, considered in the light most favorable to the government is sufficient to allow [the factfinder] to find guilt beyond a reasonable doubt." *United States v. Leonard*, 138 F.3d 906, 908 (11th Cir. 1998) (citing *United States v. Bush*, 28 F.3d 1084, 1087 (11th Cir. 1994)).

### III. DISCUSSION

Defendants have been charged pursuant to two federal regulations. The first regulation, 41 C.F.R. § 102-74.385, states: "What is the policy concerning conformity with official signs and directions? Persons in and on property must at all times comply with official signs of a prohibitory, regulatory or directory nature and with the lawful direction of Federal police officers and other authorized individuals."

The second regulation, 41 C.F.R. 102-74.420, states:

> What is the policy concerning photographs for news, advertising or commercial purposes? Except where security regulations, rules, orders, or directives apply or a Federal court order or rule prohibits it, persons entering in or on Federal property may take photographs of—

>  (a) Space occupied by a tenant agency for non-commercial purposes only with the permission of the occupying agency concerned;
>  (b) Space occupied by a tenant agency for commercial purposes only with written permission of an authorized official of the occupying agency concerned; and
>  (c) Building entrances, lobbies, foyers, corridors, or auditoriums for news purposes

Defendants make several arguments as to why they should not be found guilty of violating these regulations.

### A. Preliminary Questions

Before turning to the merits of the violations, the Court must address Defendants' assertion that the charges violate their First Amendment rights. In this regard, the first task for the Court is to determine what type of forum is at issue. "[T]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *United States Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129, 101 S. Ct. 2676, 2685 (1981). "The Supreme Court has recognized four types [of forums]: the traditional public forum, the designated public forum, the limited public forum, and the nonpublic forum. Content restrictions in the first two categories are reviewed under strict scrutiny, while regulations in the latter two survive so long as they are viewpoint neutral and reasonable." *McDonough v. Garcia*, No. 22-11421, 2024 U.S. App. LEXIS 23485, at *6 (11th Cir. Sep. 16, 2024) (internal citation omitted).

Each of the charged offenses involves SSA offices. Those offices are not traditional public forums, such as "streets and parks." *Id.* at *7. Nor are they designated

public forums that have been "opened for use by the public as a place for expressive activity," like school board meetings. *Id.* at *8. Finally, these SSA offices are not even limited public forums, which are "created for certain groups or for the discussion of certain topics." *Id.* at *9 (internal quotation marks omitted). The SSA offices are "not by tradition or designation a forum for public communication." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). Instead, they are non-public forums where individuals can go to conduct business related to the SSA so that the SSA can "manag[e] its internal operations." *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 678 (1992) (finding airport terminals operated by a government agency to be non-public forums); *see also Perry Educ. Ass'n,* 460 U.S. at 46; *McDonough*, 2024 U.S. App. LEXIS 23485, at *8–9.

Because the SSA offices are non-public forums, "the state can impose 'reasonable' regulations on speech in order to 'reserve the forum for its intended purposes,' but only if those restrictions are viewpoint neutral. *McDonough*, 2024 U.S. App. LEXIS 23485, at *8–9 (quoting *Perry*, 460 U.S. at 46). Defendants do not contest that the regulations at issue in this case are viewpoint neutral. The only question for the Court to consider is whether the regulations are reasonable. Importantly, "[t]he restriction need only be reasonable; it need not be the most reasonable or the only reasonable limitation." *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 683 (1992) (internal quotation marks omitted).

As previously noted, 41 C.F.R. § 102-74.385 requires anyone on SSA property to "at all times comply with official signs of a prohibitory, regulatory or directory nature

and with the lawful direction of Federal police officers and other authorized individuals." Luis Flores, the former assistant district manager for the Orlando SSA office, testified that this was important "[f]or security and privacy reasons." (Trial Tr. vol. 1, 18:13.) For instance, in one of the areas of the Orlando SSA office that was filmed, "You have people who are dropping off lease agreements, a lot of different types of proof or documentation that we need to process eligibility for benefits." (*Id.* at 26:18–21.) In another area, behind a barrier that Metz raised his camera to film above, is the center for processing social security cards. (Gov. Ex. 5A at 11:24–12:00; Trial Tr. vol. 1, 35–38.) According to Mr. Flores, "For Social Security card items, you're predominantly going to be asking about parents' names, mother's maiden name, father's name, place of birth. You have individuals that never had a Social Security card so they might have to provide additional information, such as certificate of naturalizations and other pertinent INS-related kind of things." (Trial Tr. vol. 1, 37:14–20.) The Court does not find this regulation to be unreasonable in light of the concerns articulated.

As for 41 C.F.R. 102-74.420, that regulation restricts the taking of photographs on federal property under four circumstances: First, "where security regulations, rules, orders, or directives apply or a Federal court order or rule prohibits it"; second, only with agency permission if the person is taking, "for non-commercial purposes," photographs of "[s]pace occupied by a tenant agency"; third, "only with written permission of an authorized official of the occupying agency concerned" if a person wants to take, "for commercial purposes," photographs of space occupied by a tenant agency; and fourth, if the photographs are "for news purposes," the person make take

- 7 -

pictures of "[b]uilding entrances, lobbies, foyers, corridors, or auditoriums." 41 C.F.R. 102-74.420.

The Court does not find this regulation to be unreasonable. Witnesses for SSA testified about the importance of the privacy of individuals coming to SSA offices. For instance, Mr. Flores testified that individuals frequently have to enter their social security numbers, present their identification documents, and discuss medical issues. (Trial Tr. vol. 1, 12:17–14:1.) Given this importance, placing restrictions on the ability to take photographs and video make sense. On its face, the requirements of 41 C.F.R. 102-74.420 appear to be reasonable. There is no evidence that there is a burdensome process to obtain permission prior to taking photographs and video. The only question is whether it is reasonable to expect individuals to comply with unspecified "security regulations, rules, orders, or directives." In each of the challenged instances, the directives that were relied upon were clearly posted in language that was easy to understand. Security personnel explained the directives and pointed the Defendants to the posted signs setting forth the directives. (*See* Gov. Exs. 1, 3, 5, 7, 9.) Therefore, I find that the requirements set forth in 41 C.F.R. 102-74.420 are reasonable.

Because I find that SSA offices are non-public forums and that the speech restrictions at issue are viewpoint neutral and reasonable, I conclude that those restrictions do not violate Defendants' First Amendment rights.

### B. Specific Counts

Based on the testimony and evidence presented at trial, and the preliminary findings stated above, the Court makes the following findings of fact and conclusions of law:

1. <u>Counts One and Two (Joshua Joseph Gray)</u>

On November 16, 2022, Defendant Gray filmed himself entering the Deland SSA building located at 1629 S. Adelle Ave., Deland, Florida 32720. (Gov. Ex. 1A 00:00–01:52). In the video, Defendant states that he is at the "Social Security Administration in, uh, where in Deland." (*Id.* 00:01–00:13.) As he enters the SSA office in the vestibule area, Defendant points his camera at and films signage that states that photography and videography are prohibited while also pointing to the signs and reading the signs out loud. (*Id.* 01:33–01:44; Gov. Exs. 2A, 2B, 2C, 2D.) Defendant enters through a second set of doors, which leads him to the SSA office lobby. (*Id.* 01:48-02:42.) He eventually sits in the corner and continues to film despite the signage. (*Id.*)

PSO Kimberly Davenport approaches Defendant, advising him that he cannot film in the lobby and that he can video record outside the doors but not inside the doors while pointing in the direction of the signs Defendant just filmed while simultaneously stating the signs are posted and management wants Defendant to leave because he did not get management's permission to film, and that she will call law enforcement and have Defendant escorted out. (*Id.* 02:41-02:58; Trial Tr. vol. 1, 124:9–133:11.) Defendant responds, asking PSO Davenport not to cause a scene and to call the Federal Protective Service, while telling her she does not know the law and continuing to film,

stating that what he is doing is lawful. (*Id*. 02:58–03:05; Trial Tr. vol. 1, 124:9–133:11.) Davenport responds, reiterating that she will call FPS and law enforcement because Defendant's filming is not lawful. (*Id*.) Defendant continues to film inside the SSA building lobby until he steps out of the lobby to speak with law enforcement called by Davenport. (*Id*. 03:05–06:49, 06:49–43:29; Trial Tr. vol. 1, 124:9–133:11.)

As to Count One, Gray pointed his camera to the official signs that prohibited photography and videography, and he read the signs aloud, yet he continued to film. Additionally, PSO Davenport provided clear, lawful direction to Gray, and he did not comply with that direction. Therefore, I find that Gray violated Section 102-74.385.

As to Count Two, there is no evidence that Gray received the permission of either the occupying agency or an authorized official of the occupying agency to film at the SSA office.[1] Therefore, I find that Gray violated Section 102-74.420.

   2. Counts Three and Four (George Douglas Metz)[2]

On January 6, 2023, Metz filmed himself entering the Ocala SSA building located at 933 E. Silver Springs Blvd., Ocala, Florida 34470. (Gov. Ex. 9 00:33–00:45,

---

[1] Although there is a difference in the type of permission required for commercial versus non-commercial photography and filming, it is undisputed that Defendants did not obtain permission from anyone to film in the areas at issue.

[2] Metz argues that no witness identified him as the person in the videos. (Doc. 67.) However, the Court was able to compare Metz's appearance in court with the person in the videos and finds that Metz is the person depicted in the videos at issue.

Metz also challenges the government's evidence as to venue. (*Id.*) But the government elicited testimony as to the location of each Social Security Office (Doc. 68 at 8), and the Court takes judicial notice that Deland, Ocala, Kissimmee, and Orlando, Florida, are all cities within the Middle District of Florida.

Trial Tr. vol. 1, 179:12–17.) As soon as he enters the building and is in the lobby, PSO Betancourt tells the Defendant that he needs to put on a mask but does not tell Defendant to stop filming at any point during the six-minute, nine-second-long video. (*Id*. 00:46, 00:00–06:09.) Defendant continues to walk around the lobby filming different things until he stops and points his camera at a glass case containing the following sign, citing 41 C.F.R. § 102-74.420:



(*Id.* 02:22–2:47; Gov. Ex. 8B.) Defendant films the sign for about twenty seconds before continuing to walk around the lobby, filming for about two more minutes before exiting the building. (Gov. Ex. 9 02:47–4:32.) As Defendant walks out of the building, he states to PSO Betancourt "alright man, I saw everything I needed to see." (*Id.* 04:25–4:26.)

As to Count Three, Metz pointed his camera to the official signs that prohibited photography and videography, yet he continued to film. Therefore, I find that Metz violated Section 102-74.385.

As to Count Four, there is no evidence that Metz received the permission of either the occupying agency or an authorized official of the occupying agency to film at the SSA office. Therefore, I find that Metz violated Section 102-74.420.

3. Counts Five and Six (Both Defendants)

On January 26, 2023, Defendants Gray and Metz filmed themselves entering the Kissimmee SSA building formerly located at 1201 E. Oak St., Kissimmee, Florida 34744. (Gov. Ex. 3 (Gray 00:31–01:10, Metz 01:23–01:58)). At the beginning of the recording, PSO Diaz instructs them that they can record in the vestibule area, but they cannot record in the lobby. (*Id.* 01:44–02:10.) In response, Defendant Gray asks PSO Diaz: "Are those rules posted anywhere?" (*Id.* 02:13–02:14.) PSO Diaz responds, "They are right here," and proceeds to point at a glass case contained in the vestibule area. (*Id.* 02:14–02:27.) Diaz once again instructs Gray that they cannot record in the lobby, but they can record in the vestibule area. (*Id.* 02:28–03:17.)

Defendants continue filming while Gray expresses his disagreement with Diaz's directive to stop recording in the lobby. (*Id.* 03:18–05:00.) Defendant Gray gives Diaz a

printed copy of 41 C.F.R. § 102-74.420, directing his attention to subsection (c) as they continue to film. (*Id.* 04:45–05:05.) Diaz proceeds to read the printout and reiterates to them they have a right to record whether for news or personal purposes from the vestibule area but not in the lobby. (*Id.* 05:05–10:00.) Defendants continue to film. (*Id.*) Diaz purportedly calls a manager, and they direct him to refer Defendants to a sign posted in the vestibule area that prohibits photography and videography. (Gov. Ex. 4.) This sign differs from the signs Metz filmed in the Ocala SSA lobby (Gov. Ex. 8A) and the signs posted in the lobby and vestibule area of the Orlando SSA building (Gov. Ex. 6A, 6B), but still notes that photographs and videos are prohibited. Defendants follow Diaz outside the lobby into the vestibule area, and Defendant Gray states that the sign posted on the wall is referring to the printout he just handed Diaz, reiterating that the sign just refers to 41 C.F.R. § 102-74.420, and Defendants state that the sign posted means that they can film as long as it is for news purposes. (Gov. Ex. 9 11:30–14:16.) They request the Federal Protective Service to respond, but Diaz informs them it will take some time for them to arrive. (*Id.*) Defendant Gray thanks Diaz for not giving them a hard time or stopping him from recording, then Defendants proceed to leave and stop filming. (*Id.* 14:16–14:34.)

As to Count Five, Gray and Metz pointed their camera to the official signs that prohibited photography and videography, yet they continued to film. PSO Diaz provided a clear, lawful direction to Gray and Metz to confine their filming to the vestibule area, yet they did not comply with that direction. Therefore, I find that Gray and Metz each violated Section 102-74.385.

As to Count Six, there is no evidence that either Gray or Metz received the permission of either the occupying agency or an authorized official of the occupying agency to film at the SSA office. Therefore, I find that both Gray and Metz violated Section 102-74.420.

    4. <u>Counts Seven and Eight (Both Defendants)</u>

On January 30, 2023, Defendants Gray and Metz filmed themselves entering the Orlando SSA building formerly located at 5520 Gatlin Ave., Ste. 101, Orlando, Florida 32812. (Gov. Ex. 5A (Gray 00:08–00:31, Metz 00:30–00:34); Trial Tr. vol. 1, 87:3–25.) Once Defendants entered the lobby, PSO Pierre Suarez instructs Defendant Gray that he cannot film in the lobby without permission. (Gov. Ex. 5A 00:30–00:40; Trial Tr. vol. 1, 85:5–114:24.) Gray responds that he can film as a member of the media. (*Id.* 00:41–1:58.) Suarez then asks Gray to show his media credentials, and Gray asks Suarez if he is familiar with the law and states he does not need to show media credentials. (*Id.*) Gray continues to film as Suarez turns his attention to Defendant Metz. (*Id.*) Suarez proceeds to call for management while Defendants continue to film. (*Id.* 01:59–03:04.) Suarez directs Defendants' attention to a glass case in the lobby containing a sign that photography and videography are prohibited, as well as a copy of GSA's Rules and Regulations Governing Conduct on Federal Property (Gray Ex. 1), which contains a copy of 41 C.F.R. §§ 102-74.385 and 102-74.420. (*Id.* 03:01–3:59.) These signs differ from the signs contained in the vestibule area at the same location (Gov. Exs. 6A, 6B), the sign Metz recorded in the Ocala SSA lobby (Gov. Ex. 8B), and the sign PSO Diaz directed Defendants to in the Kissimmee SSA vestibule area (Gov.

Ex. 4). Defendants continue to film as PSO Diaz ask again for Defendants' media credentials. (Gov. Ex. 5a 04:50–06:17.) PSO Diaz then walks away to assist other customers as Defendants continue to film. (*Id.*)

Metz sits in the lobby and continues to film as Gray attempts to go next door to film at the Orlando SSA Card Center, but the PSO outside instructs him that he will have to get in the back of the long line of customers waiting outside to go inside the Card Center. (*Id.* 06:18–07:01.) Gray abandons his plan and heads back to the SSA office, sits down next to Metz, and continues filming with him. (*Id.*) At one point, Metz puts his camera over a barrier separating the SSA office and the Card Center and films customers at windows on the Card Center side, leading Suarez to tell them they can continue to film as long as they stay in the SSA building lobby away from the customer windows. (*Id.* 08:42–12:32.)

Defendants continue to film in the lobby for about seven more minutes before Luis Flores, who was then the Assistant District Manager of the Orlando SSA office, comes out to speak with Defendants. (*Id.* 12:33–18:41; Trial Tr. vol. 1, 8:20–81:25.) Flores tells Defendants that he spoke with the District Manager, and she did not give prior permission for Defendants to film. (Gov. Ex. 5A 18:40–19:02.) Defendants continue to film and reiterate they did not need permission, showed Flores 41 C.F.R. § 102-74.420, and state that they are in compliance with the regulation. (*Id.* 19:02–19:49.) Flores states that he will get the contact information for SSA's regional public affairs office so they can receive permission to film, then asks Defendants to leave. (*Id.* 19:50–19:52.) Defendants refuse to leave and keep filming while Flores gets the contact

information. (*Id.* 19:51–23:22.) Flores returns with the contact information for the regional public affairs office, and Defendants continue to talk to him for approximately seven more minutes about their interpretation of 41 C.F.R. § 102-74.420, while Flores tells them they need written permission from management to film and asks them to leave the facility several times or the Orlando Police Department will escort them out. (*Id.* 23:23–30:10.) After Flores walks away, Defendants film for approximately ten more minutes before saying they are about to leave, and the video cuts off. (Gov. Ex. 5B 00:00–10:10.)

As to Count Seven, Gray and Metz pointed their camera to the official signs that prohibited photography and videography, yet they continued to film. While PSO Suarez initially told the Defendants that they could not film inside the lobby, he later told them that they could film in the lobby. However, Mr. Flores, the Assistant District Manager, clearly directed the Defendants to stop filming, and they refused to do so. Considering the clear signage and the clear instruction from Mr. Flores, I find that both Defendants violated Section 102-74.385.

As to Count Eight, it is clear from the interaction with Mr. Flores that neither Gray nor Metz had received the permission of either the occupying agency or an authorized official of the occupying agency to film at the SSA office. Therefore, I find that both Gray and Metz violated Section 102-74.420.

## IV. CONCLUSION

Defendants truly might have believed that they were acting within the confines of the law and exercising their First Amendment rights, but "innocence cannot be asserted of an action which violates existing law, and ignorance of the law will not excuse." *Shevlin-Carpenter Co. v. Minnesota*, 218 U.S. 57, 68 (1910). For the reasons set forth above, I find that the Motions should be **DENIED** and that Defendants are guilty of the violations as charged in the Information.

**DONE** and **ORDERED** in Orlando, Florida on December 20, 2024.

EMBRY J. KIDD
UNITED STATES MAGISTRATE JUDGE